**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

AMERICAN INSTITUTE FOR PREVENTIVE
MEDICINE, INC.,

        Plaintiff/Counterclaim Defendant,

v.                             Case No. 09-11195

OAKSTONE PUBLISHING, LLC,

        Defendant/Counterclaim Plaintiff.

                                      /

### OPINION AND ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANT'S COUNTERCLAIM; (2) DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT I OF THE COMPLAINT; AND (3) DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS II-IV OF ITS COUNTERCLAIM

Pending before the court are three motions for summary judgment. Plaintiff has moved summary judgment on all five of Defendant's counterclaim. Defendant has filed two motions: one for summary judgment on Plaintiff's breach of contract claim, Count I of the complaint; and another for summary judgment on Counts II-IV of its counterclaim. The court will grant in part and deny in part Plaintiff's motion for summary judgment on Defendant's counterclaim, and it will deny both of Defendant's motions.

### I. BACKGROUND[1]

This dispute centers on a distributor agreement entered into by the parties. Plaintiff and Defendant are corporations in the business of providing healthcare related publications and products to corporations and other organizations trying to improve the

---

[1]The following facts are undisputed unless otherwise noted.

"wellness" of their individual employees and members. Defendant, through its operating division, Personal Best, sells health related calendars and newsletters to corporate wellness programs. Plaintiff develops and markets health promotion programs and publications. Don Powell is Plaintiff's founder and current CEO. For the period relevant to this motion, Cori Whitaker was Defendant's vice president and a key representative in Defendant's dealings with Plaintiff.

One of the litigants' largest customer bases is the Veterans Administration ("VA"). The VA is a large group of entities that provide services to veterans and includes particular hospitals as well as large federal organizations. Entities in the VA are organized into networks, called Veterans Integrated Service Networks ("VISNs"). The VISNs are usually broken down by geographic regions. For example, VISN 20 includes many states from the Northwest region of the country. Plaintiff began developing the VA market in the early 2000s. Amy Cohen was Plaintiff's employee in charge of sales to VA customers. The parties eventually entered into a distributor agreement controlling Plaintiff's distribution and promotion of Defendant's calendars to VA customers and all of Defendant's products to non-VA customers.

In 2003, Plaintiff was in the process of selling a product to a large VA customer, Bay Pines, when it learned that Bay Pines was interested in purchasing calendars. (Pl.'s Mot. for Summ. J. on Def.'s Countercl. ¶ 18.) Eventually, Plaintiff recommended Defendant as a source of calendars to Bay Pines. (*Id.* ¶ 20.) Because Plaintiff and Defendant were, in some sense, competitors in the marketplace, Plaintiff was concerned about opening the VA market to Defendant by giving the Bay Pines lead to Defendant. The parties dispute the extent to which the negotiation of the distributor

agreement was related to the Bay Pines transaction. Plaintiff suggests that the distributor agreement partially settled a dispute over what Defendant owed Plaintiff for recommending it to Bay Pines. (Pl.'s Resp. to Def.'s Mot. for Summ. J. on Count I at 4.) Defendant maintains that negotiating the distributor agreement was separate and distinct from the Bay Pines transaction. (Def.'s Resp. to Pl.'s Mot. for Summ. J. on Def.'s Countercl. ¶ 22.)

During negotiations, Plaintiff made representations about the nature of its VA contacts. The parties dispute the nature of these statements. Powell, Whitaker, and Susan Jackson, Plaintiff's vice president, were the primary individuals involved in the discussions and negotiations surrounding the distributor agreement. (Def.'s Resp. to Pl.'s Mot. for Summ. J. on Def.'s Countercl., Ex. 3, Whitaker Dep. at 87-89.) Plaintiff maintains that it made no statements concerning the number of contacts that it had or the amount of business that the contacts would yield. But Whitaker's testimony, the evidence cited by Plaintiff, suggests that Plaintiff described its contacts being able to yield "a lot," "large volumes" of sales, and "high volumes of VA potential." (*Id.* at 55-56.)

The parties also dispute the nature of the Plaintiff's representations concerning whether it would market Defendant's products to the exclusion of other products, including Plaintiff's. Plaintiff maintains that it never made any representations of exclusivity during negotiations. But Defendant, again, points to Whitaker's testimony to support its contention that Plaintiff made statements that it would exclusively promote Defendant's calendar to Plaintiff's VA contacts. Also, according to Whitaker, the day before the agreement was signed, she asked Powell whether Plaintiff had agreed to exclusively promote Defendant's calendars to its VA contacts. Powell did not respond.

3

The next day, Whitaker signed the distributor agreement. The day following the agreement's execution, Jackson emailed Whitaker and stated that Plaintiff would exclusively promote Defendant's products to VA-customers, and give Defendant "preferred vendor" status concerning non-VA customers.

The distributor agreement is a single page and sets forth various commissions to be paid by Defendant to Plaintiff. (Pl.'s Resp. to Def.'s Mot. for Summ. J. on Def.'s Countercl. Ex. 4, Distributor Agreement.) The agreement contains no terms concerning exclusivity and assigns no duties to Plaintiff. (Distributor Agreement.) Defendant terminated the distributor agreement in April 2009, claiming that it had a right to do so because of Plaintiff's material breach.

The parties dispute the extent to which Plaintiff promoted Defendant's calendars to the VA customers, as well as the extent to which it marketed and sold other calendars while the distributor agreement was in place. In 2006, Plaintiff began selling newsletters to VA customers. (Pl.'s Mot. for Summ. J. on Def.'s Countercl. ¶ 14.) As early as February 2009, Plaintiff considered selling calenders to VA customers. And in March 2009, it prepared surveys for VA customers to assist in creating a calendar. (Def.'s Resp. to Pl.'s Mot. for Summ. J. on Def.'s Countercl. ¶ 15.) The record does not contain any evidence of Plaintiff actually selling its calendars to VA customers before the contract was terminated in April 2009.

## II. STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003). "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

The court does not weigh the evidence to determine the truth of the matter, but rather, to determine if the evidence produced creates a genuine issue for trial. *Sagan*, 342 F.3d at 497 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party discharges its burden by "'showing' –that is, pointing out to the district court– that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter,* 369 F.3d 906, 909 (2004) (citing *Celotex*, 477 U.S. at 325). The burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton,* 369 F.3d at 909 (citing *Matsushita*, 475 U.S. at 587 (1986). Summary judgment is not

appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson*, 477 U.S. at 251-52 (1986).

The existence of a factual dispute alone does not, however, defeat a properly supported motion for summary judgment—the disputed factual issue must be material. *See id.* at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict – 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'" (alteration in original) (citation omitted)). A fact is "material" for purposes of summary judgment when proof of that fact would establish or refute an essential element of the claim or a defense advanced by either party. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citation omitted).

### III. DISCUSSION

### A. Defendant's Counterclaim

### 1. Count I: Breach of Contract

Defendant alleges that Plaintiff breached the distributor agreement by failing to use good faith and best efforts and by breaching its duty to represent Defendant's calendar exclusively to VA customers and as a "preferred vendor" to non-VA clients. (Def.'s Resp. to Pl.'s Mot. for Summ. J. on Def.'s Countercl. 1, 4.) Only Plaintiff has moved for summary judgment on this count. Because Defendant has produced sufficient evidence to allow a finding of an implied covenant of good faith and a breach of that covenant, the court will not grant summary judgment on this count.

Plaintiff argues that none of these duties are part of the distributor agreement. In fact, both parties agree that the distributor agreement contains no explicit mention of these duties. (Def.'s Resp. to Pl.'s Mot. for Summ. J. on Def.'s Countercl. 4.) Instead, Defendant maintains that the exclusivity and "preferred vendor" duties were agreed on orally during negotiations and are "implicit" in the distributor agreement's provisions. Defendant further argues that the distributor agreement contains an implied covenant of good faith and a duty to use best efforts to promote Defendant's products. The essence of Plaintiff's argument is that the contract is unambiguous, so the terms of the written contract must be applied. Accordingly, no duties concerning exclusivity, "preferred vendor" status, or good faith should be imputed.

When "contractual language is unambiguous, courts must interpret and enforce the contract as written because an unambiguous contract reflects the parties' intent as a matter of law." *In re Smith Trust*, 745 N.W.2d 754 (Mich. 2008). Nevertheless, parties may have agreements and duties ancillary to a written agreement. Although the parties do not discuss the issue, an examination of the parol evidence rule is instructive. The Michigan Court of Appeals explains the parol evidence rule as follows: "[p]arol evidence of contract negotiations, or of prior or *contemporaneous agreements* that contradict or vary the written contract, is not admissible to vary the terms of a contract which is clear and unambiguous." *Schmude Oil Co. v. Omar Operating Co.*, 458 N.W.2d 659, 663 (Mich. Ct. App. 1990) (emphasis added). The corollary of the parol evidence rule is: if the rule does not apply, parol evidence *may be admitted to "vary the terms of a contract which is clear and unambiguous."* *Id.* (emphasis added). Defendant's argument therefore reduces to an assertion that the parol evidence rule does not apply to the

distributor agreement, and the court should consider whether a contemporaneous agreement between the parties exists concerning exclusivity and "preferred vendor" status exists. If the parol evidence rule applies then Plaintiff's argument that the unambiguous language of the contract controls is correct.

Although the parol evidence rule often operates to bar extrinsic evidence when considering a written contract, the rule applies only where the parties intended the written instrument to be integrated—a complete expression of their agreement with regard to the matters covered. "Extrinsic evidence of prior or contemporaneous agreements or negotiations is admissible as it bears on this threshold question of whether the written instrument is such an 'integrated' agreement." *NAG Enterprises, Inc. v. All State Indus., Inc.*, 285 N.W.2d 770, 771 (Mich. 1979). In spite of this rule, if a contract contains a merger clause, the merger clause is conclusive and parol evidence is inadmissible to show that the agreement is not integrated except in cases of fraud that invalidate the integration clause or where an agreement is obviously incomplete "on its face." *Dominion Midwest Energy, Inc. v. Mich. Pub. Serv. Com'n*, No. 280391, 2009 WL 3465470, *4-5 (Mich. Ct. App. Oct. 27, 2009).

Here, neither party argues that the distributor agreement is integrated. Moreover, there is sufficient evidence in the record to support a finding that the contract was not integrated. The agreement contains no merger clause, is confined to one page, and assigns duties only to Defendant. Also, Whitaker's questions via email suggest that Defendant did not consider the distributor agreement to be the complete expression of the parties' agreement. Before the distributor agreement was signed, Whitaker asked about exclusivity: "It was my understanding *from our conference call* that AIPL would

recommend Personal Best exclusively." (Powell Dep., Ex. 1 at 137 (emphasis added).)
Whitaker attached the actual distributor agreement to the email. Accordingly,
Whitaker's questioning can indicate that she thought there were commitments and
agreements outside the terms of the written distributor agreement. When asked,
Plaintiff did not correct this assumption before the contract was signed; it did not
suggest the addition of a merger clause, and, after the contract was signed, it confirmed
Defendant's expectation of exclusivity. This evidence corroborates Defendant's stated
understanding that agreements outside of the written instrument existed. Evidence
exists that could support a conclusion that neither party considered the contract to be
the complete expression of the parties' agreements and obligations.

Defendant has supported its claim of exclusivity and "preferred vendor" contract
terms with sufficient evidence to survive summary judgment. To determine whether
there was mutual assent to a contract or a particular contract term, Michigan courts "use
an objective test, 'looking to the expressed words of the parties and their visible acts'"
and ask whether a reasonable person could have interpreted the words or conduct in
the manner that is alleged. *Rowe v. Montgomery Ward & Co.*, 473 N.W.2d 268, 273
(Mich. 1991). Defendant maintains that the parties assented to exclusivity and
preferred-vendor terms based on: (1) an argument that those terms are implied by the
distributor agreement's perpetual commission term; (2) Whitaker's deposition testimony
about the contract discussions leading to the execution of the distributor agreement;
and (3) Plaintiff's confirmation of such terms after the agreement was signed. Viewed in
the light most favorable to Defendant, this is enough to allow a reasonable jury to find
that Plaintiff assented to the exclusivity and preferred vendor terms. Whitaker's

deposition testimony suggests that the Plaintiff's statements during the negotiation "discussions" would suggest to a reasonable person that Plaintiff manifested assent to the exclusivity and preferred vendor terms. Plaintiff is correct that much of Whitaker's testimony is vague and based on assumptions about what Plaintiff intended. Indeed, Defendant's argument that Plaintiff's statement that it would "partner" with Defendant somehow implies exclusivity is unconvincing. Nevertheless, Whitaker testified that the "whole discussion" was about exclusivity. (Whitaker Dep. 89.) Further, Plaintiff's email to Defendant, sent the day after the distributor agreement was signed, could be interpreted by a jury as Plaintiff's admission that it understood that the parties had assented to exclusivity and preferred vendor terms. And while Plaintiff is correct that the email was sent *after* contract formation, it is probative of what Plaintiff thought the parties had assented to, and, therefore, what a reasonable person would have thought the parties assented to.

But, Plaintiff argues, even if there are exclusivity and preferred vendor terms, Defendant "concedes that it is not aware of any instances where [Plaintiff] sold another company's calendar to a VA entity or where [Plaintiff] sold its own calendar to a VA until after termination of the Agreement." (Pl.'s Mot. for Summ. J. on Def.'s Countercl. 14-15.) The parties do not dispute that the distributor agreement was terminated on April 1, 2009, and that Plaintiff began selling calendars to VA-customers in April 2009. In its brief, Defendant cites Powell's deposition to support its contention that Plaintiff violated the alleged exclusivity term by "competing with Oakstone in the calendar business." (Def.'s Resp. to Pl.'s Mot. for Summ. J. on Def.'s Countercl. 4.) But Powell said only that, in March 2009, Plaintiff sent a survey to VM customers to inquire as to their

calendar preferences. (Powell Dep. 70.) This does not support Defendant's contention that Plaintiff violated an exclusivity agreement. In its statement of facts, Defendant also alleges that Plaintiff "stopped promoting [Defendant's] calendar . . . after May 2006." (Def.'s Resp. to Pl.'s Mot. for Summ. J. on Def.'s Countercl. ¶ 61.) But the testimony cited by Defendant to support this contention explicitly states that the reason Plaintiff stopped promoting Defendant's calendar was because Defendant asked Plaintiff to stop doing so. (Powell Dep. 98-99; Cohen Dep., Ex. 4 at 34.) Defendant has therefore failed to point to any evidence suggesting that Plaintiff breached the alleged exclusivity term.

Defendant argues that Plaintiff breached the alleged "preferred vendor" term because Plaintiff did not ask non-VA customers to renew their subscriptions to Defendant's newsletter, but, instead, promoted Plaintiff's own newsletter by telling a non-VA customer that "[m]ost of our clients have decided to switch to [Plaintiff's] version, as it's less expensive, interesting and very attractive." (Def.'s Resp. to Pl.'s Mot. for Summ. J. on Def.'s Countercl. Ex. 9.) Defendant does not allege or offer any evidence suggesting that Plaintiff's comment was inaccurate. And other than a bare assertion that Plaintiff's promotion of the newsletter was not "preferred," Defendant does not explain why Plaintiff's representation to the non-VA customer was a breach of a preferred vendor term. Indeed, Defendant makes no argument and cites no evidence explaining exactly what the parties intended "preferred vendor" status to mean. In the absence of such argument and evidence, the court cannot find that Defendant has produced enough evidence to survive summary judgment as to whether the Plaintiff breached the alleged preferred vendor term.

Nevertheless, summary judgment on Defendant's breach of contract counterclaim is inappropriate, because of a potential implied covenants of good faith

and best efforts.  Plaintiff argues that such terms cannot, as a matter of law, be imputed to it.  Defendant argues that summary judgment for Plaintiff on the breach of contract counterclaim is not appropriate because of potential "best efforts" and "good faith" duties which may be implied in the contract.  "Best efforts" and "good faith" duties are legally distinct concepts.

A party to a contract may have a duty to use "best efforts"[2] to perform a particular task if no such duty would leave the contract void for want of consideration.  *See ParaData Computer Networks, Inc. v. Telebit Corp.,* 830 F.Supp. 1001, 1006 (E.D. Mich. 1993)*; see also Wood v. Lucy, Lady Duff-Gordon*, 118 N.E. 214 (N.Y. 1917). Here, the implication of Defendant's exclusivity theory is that Plaintiff provided consideration—it promised to refrain from doing something that it could otherwise do, viz. sell other vendors' calendars to VA customers.  So, if Defendant prevails on its exclusivity argument, then Plaintiff provided consideration and there can be no implied best efforts term.  If, on the other hand, Defendant's theory of exclusivity ultimately fails, Plaintiff still provided consideration.  Plaintiff has produced evidence sufficient to support a finding that it agreed to accept a 10% commission on the Bay Pines transaction rather than the 20% that Plaintiff argued it was due.  (Whitaker Dep. 48, 55.) Agreeing to accept a lower payment in lieu of one due (or arguably due) is a valid form of consideration.  So regardless of the merits of Defendant's exclusivity argument, there

---

[2] "While the phrase 'best efforts' is often used to describe the extent of the implied undertaking, this has properly been termed an 'extravagant' phrase.  A more accurate description of the obligation owed would be the exercise of 'due diligence' or 'reasonable efforts.'"  *Permanence Corp. v. Kennametal, Inc.*, 908 F.2d 98, 100 n.2 (6th Cir. 1990).

is evidence sufficient to allow a jury to conclude that the distributor agreement is supported by consideration. Nevertheless, if the jury rejects the evidence supporting these theories of consideration, then a duty to employ best efforts may be implied by law. Michigan courts have also recognized an implied duty of good faith where "a party to a contract makes the manner of its performance a matter of its own discretion." *Burkhardt v. City Nat'l Bank of Detroit*, 226 N.W.2d 678, 680 (Mich. 1975). As discussed above, Defendant has produced sufficient evidence to allow a jury to conclude that Plaintiff agreed to sell and promote Defendant's calendar, exclusive of other calendars, to its VA customers. The evidence likewise allows a conclusion that the nature of this promotion was left to Plaintiff's discretion. Accordingly, Defendant's position that Plaintiff had an implied covenant of good faith must likewise survive Plaintiff's motion for summary judgment.

### 2. Count II: Fraudulent Inducement

Defendant second counterclaim alleges fraudulent inducement based on Plaintiff's representations of the nature of its VA contacts. The court will grant summary judgment for Plaintiff on this count. Both Plaintiff and Defendant have moved for summary judgment on this count. In Defendant's *brief* in support of summary judgment on this count, however, Defendant also argues that its fraudulent inducement claim is supported by Plaintiff's alleged exclusivity representations. But, as Plaintiff points out, the fraudulent inducement claim in Plaintiff's amended answer cites only the representations concerning Plaintiff's VA contacts. Accordingly, Defendant has not pleaded a fraudulent inducement claim based on representations of exclusivity, and it cannot support its motion for summary judgment or defend against Plaintiff's motion for

summary judgment with the alleged exclusivity representations. In a reply brief,

Defendant asks the court permission to amend its fraudulent inducement counterclaim

to add the representations about exclusivity. Such a motion is not appropriately raised

in a responsive pleading. The local rules and the court's practice guidelines require that

motions and responses be accompanied by a separate brief. E.D. Mich. LR 7.1(b);

Practice Guidelines for Judge Robert H. Cleland.[3] Under no circumstances may a

motion be included within or tacked onto a response or a reply. *See* E.D. Mich. LR

7.1(b).

Plaintiff argues that the representations concerning the nature of Plaintiff's VA

contacts may not serve as the basis for a fraudulent inducement claim because the

representations were opinion rather the fact. The court agrees. "Fraud in the

inducement occurs where a party materially misrepresents future conduct under

circumstances in which the assertions may reasonably be expected to be relied upon

and are relied upon. Fraud in the inducement to enter a contract renders the contract

voidable at the option of the defrauded party." *Samuel D. Begola Servs. Inc. v. Wild

Bros.*, 534 N.W.2d 217, 219 (Mich. Ct. App. 1995). The expression of a mere opinion or

a salesperson's "puffing" is not actionable as the basis for fraudulent inducement. *See

Johnson v. Botsford Gen. Hosp.*, 748 N.W.2d 907, 911 n.1 (Mich. Ct. App. 2008).

"Whether a specific representation is classified as an expression of opinion or an

actionable statement of fact is contingent upon the circumstances of each case."

*Foreman v. Foreman*, 701 N.W.2d 167, 175 (Mich. Ct. App. 2005). "While expressions

---

[3]  http://www.mied.uscourts.gov/Judges/guidelines/index.cfm?judgeID=12.

of opinion in good faith cannot be made the basis of recovery in a fraud action, statements of opinion made in bad faith by one who is possessed of superior knowledge respecting such matters, with a design to deceive and mislead, the party making them must respond." *Id.* (internal citations and quotation marks omitted).

Defendant supports its contention that Plaintiff misrepresented the nature of its VA contacts with Whitaker's deposition testimony:

> [AIPM] assured us that there was a lot more business to be had that they could bring to the table. And in our business, as long as we are creating a certain kind of product, the whole idea is to grow that product. And so we knew we were starting a VA calendar with Diana Akins [Bay Pines], and our goal was going to be to grow it by getting other VA calendar buyers. And AIPM said that they could deliver a lot more volume to that print run.
>
> . . .
>
> . . . [W]e were led to believe that there were other large volumes that could be achieved by AIPM prospects in their database of folks.

(Whitaker Depo., Appdx Ex. 3 at 55:12-25; 56:1-18).

> Q. What led you to believe that the other potential purchasers, VA purchasers, of calendars would be at the same size or volume as the purchase that had been made by Diana Akins [Bay Pines]?
>
> A. Through verbal conversations and the e-mail conversations, it—it was expressed that there were high volumes of VA potential through their—through their contacts in their database.

*Id.*

When examined, however, the statements attributed to Plaintiff by Defendant are nothing more than the expression of an opinion and sales "puffery." In essence, Plaintiff represented that its contacts could bring "a lot more" business to the table, and would yield "large volumes" of sales and "high volumes of VA potential." Such statements are insufficiently concrete to rise beyond conjecture about future events. They are simply

15

Plaintiff's opinion as to the quality of its contacts.  Without more concrete statements about the nature of the contacts, e.g., the particular number or identities of the contacts, Defendant cannot base its fraud claim on these representations concerning VA contacts.

Defendant cites *ParaData* to support its assertion that Plaintiff's comments about the nature of its VA contacts went beyond opinion and puffery.  In *ParaData*, the defendant represented that it had resellers in its distribution network that could deal in the plaintiff's "high-end" products.  *ParaData*, 830 F. Supp. at 1002.  The *ParaData* court held that the plaintiff's fraud claims survived summary judgment.  There are two critical differences between *ParaData* and this case.  First, the representations in *ParaData* concerned whether the defendant had *any* contacts that would be capable of dealing in plaintiff's products, i.e., whether the defendant had any contacts at all.  If Plaintiff had represented to Defendant that it had contacts with customers interested in calendars when in fact it had none, then *ParaData* would be on point with this case.  Instead, Plaintiff's representations concern the quality of their contacts, not the existence of them.  Second, the representation cited by Defendant was only one of eight representations cited by the district court to support the plaintiff's fraud claim.  Accordingly, it is not clear whether the defendant's representation about its distributor network would have been sufficient standing alone to withstand summary judgment.  *ParaData* is distinguishable from this case.

Michigan's common law of fraud yields several cases that bear on whether Plaintiff's statements concerning its VA contacts rise above opinion and puffery.  For example, statements that a franchise location was a "goldmine," that the franchise had

an "excellent product," and that there were "no bad [franchise] locations" were sales puffery and could not serve as the basis for a fraud cause of action. *Van Tassel v. McDonald Corp.*, 407 N.W.2d 6, 9 (Mich. Ct. App. 1987). Also, estimates as to the value and salability of a car dealership's inventory were "statements of opinion, not fact." *Schuler v. Am. Motors Sales Corp.*, 197 N.W.2d 493, 495 (Mich. Ct. App. 1972). The court finds that the statements in this case are along the lines of those is *Van Tassel* and *Schuler*. Without evidence of intent to deceive or bad faith, such statements, even if made by Plaintiff, cannot be the basis for a fraudulent misrepresentation. The court will grant summary judgment for Plaintiff on this count.

### 3. Count III: Fraudulent Misrepresentation

Both parties have moved for summary judgment on Defendant's fraud counterclaim. Because Defendant has failed to produce evidence sufficient to allow a jury to find that Defendant suffered an injury from any alleged fraud, the court will grant Plaintiff's motion on this count. Under Michigan law, an intentional fraudulent misrepresentation claim requires the following elements: "(1) that defendant made a material misrepresentation; (2) that the representation was false; (3) when defendant made the representation, defendant knew that it was false, or made it recklessly without knowledge of its truth or falsity; (4) that defendant made it with the intent that plaintiff would act upon it; (5) that plaintiff acted in reliance upon it; and (6) that plaintiff suffered injury." *Baker v. Arbor Drugs, Inc.*, 544 N.W.2d 727, 732 (1996). A negligently-made misrepresentation may also be actionable given "a business or professional duty of care to provide accurate information." *See Mickam v. Joseph Louis Palace Trust*, 849 F. Supp. 516, 521 (E.D. Mich.1993) (citing Williams v. Polgar, 391 Mich. 6, 215 N.W.2d

149 (1974)); *see generally Erickson's Flooring & Supply Co., Inc. v. Tembec, Inc.*, 212 F. App'x 558, 562-63 (6th Cir. 2007).

Defendant cites two representations to support its fraud claim: (1) Plaintiff's statements concerning the nature of its VA contacts; and (2) Plaintiff's statements concerning exclusivity and preferred vendor status. As discussed in the previous subsection, Plaintiff's statements about the nature of its VA contacts cannot form the basis for a fraud claim. Also, as discussed in section III.A.1, Defendant has introduced sufficient evidence to allow a jury to find that Plaintiff made representations that it would exclusively promote Defendant's products to VA customers, and give Defendant preferred vendor status regarding non-VA customers.

Plaintiff maintains, however, that these statements cannot support a fraud claim because they are statements of intent to perform a future actions. "To establish fraud, the allegedly false statements must relate to past or existing facts, not to future promises or expectations.*" Cook v. Little Caesar Enters., Inc.*, 210 F.3d 653, 658 (6th Cir. 2000). "[A]n action for fraudulent misrepresentation must be predicated upon a statement relating to a past or an existing fact. Future promises are contractual and do not constitute fraud." *Id.* (citing *Hi-Way Motor Co. v. Int'l Harvester Co.*, 247 N.W.2d 813 (Mich. 1976)). But an exception to this requirement exists where "a fraudulent misrepresentation may be based upon a promise made in bad faith without intention of performance." *Id.* (citing *Hi-Way Motor Co.*). Defendant argues that it has produced sufficient evidence to allow a jury to find that the bad faith exception applies; the court agrees. Jackson's email is a plain statement of an intent to abide by exclusivity and preferred vendor terms. Powell, Plaintiff's founder and CEO, testified that Plaintiff never

18

had any intention to represent Defendant exclusively.  Accordingly, Defendant has produced evidence sufficient to survive summary judgment on the issue of whether the bad faith exception applies.

Plaintiff also argues that Defendant's fraud counterclaim fails because it was unreasonable to rely on Jackson's email.  Plaintiff points out that Whitaker, the recipient of Jackson's email, did not know what position Jackson had with Plaintiff or what her job responsibilities were.  (Whitaker Dep. at 87-89.)  Defendant, however, highlights Whitaker's testimony that she considered Jackson to be Powell's "right hand," and that Jackson was present during the negotiations and discussions concerning the distributor agreement.  (*Id.* 90.)  Given this conflicting evidence as to whether Defendant's reliance was reasonable, summary judgment on this issue is not appropriate.

The parties also dispute whether Defendant has produced sufficient evidence to allow a jury to find that it was injured by relying on Plaintiff's alleged misrepresentations. Defendant argues that it suffered injury because it paid commissions to Plaintiff and shared confidential and sensitive information concerning its pricing of products.  Plaintiff argues these allegations do not support injury because the information cited by Defendant was not confidential.

But Defendant's injury argument suffers from an even more fundamental flaw: Defendant has not produced sufficient evidence to allow a jury to conclude that it suffered injury from relying on Plaintiff's representations, because it has not produced sufficient evidence to allow a conclusion that Plaintiff violated the alleged promise of exclusivity or preferred vendor status.  *See, supra*, § III.A.1.  Quite simply, without first showing that the promise was broken, Defendant cannot show that injury flowed from

19

relying on the promise.  Defendant has failed to meet its burden on the injury element of its fraud claim, and Plaintiff's motion for summary judgment must therefore be granted on this counterclaim.

### 4. Count IV: Silent Fraud

Defendant's silent fraud counterclaim is based on Plaintiff's alleged failure to inform Defendant that it had no intention to promote its calendars exclusively or give Defendant preferred vendor status.  To establish a silent fraud claim, just as with a standard fraud claim, the claimant must show that injury resulted from the silent fraud. *Int'l Fidelity Ins. Co. v. Rich ex rel. Samuel Rich Trust*, No. 198234, 1998 WL 1997670, *3 (Mich. Ct. App. Mar. 13, 1998) (citing *Clement-Rowe v. Mich. Health Care Corp.*, 538 N.W.2d 20 (Mich. Ct. App. 1995)).  Because Defendant failed to produce evidence establishing that it was injured, *see* section III.A.3, it has likewise failed to do so concerning its silent fraud count.  Accordingly, summary judgment on this counterclaim should be granted to Plaintiff.

### 5. Count V: Tortious Interference

Plaintiff has moved for summary judgment on Defendant's tortious interference counterclaim.  Defendant claims that Plaintiff tortiously interfered with its business relationships with both VA and non-VA customers.  Plaintiff argues that Defendant's tortious interference claim regarding the VA customers should be rejected because it did not tortiously interfere.  Plaintiff also argues that the claim regarding the non-VA customers should be rejected because Defendant failed to produce, after proper notice, a 30(b)(6) deponent who was knowledgeable of the claim.  The court agrees with

Plaintiff regarding the VA-customer interference claim, but rejects Plaintiff's argument

regarding the non-VA-customer interference claim.

> To establish a prima facie case of tortious interference with a business relationship, plaintiffs must show: (1) the existence of a valid business relation (not necessarily evidenced by an enforceable contract) or expectancy; (2) knowledge of the relationship or expectancy on the part of the defendant interferer; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *Trepel v. Pontiac Osteopathic Hospital*, 354 N.W.2d 341 (1984). In *Formall, Inc. v. Community Nat'l Bank of Pontiac*, 421 N.W.2d 289 (1988), this Court further explained the third element:

>> [O]ne who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another. [*Feldman v. Green*, 360 N.W.2d 881 (1984).]

*Michigan Podiatric Med. Ass'n v. Nat'l Foot Care Program, Inc.*, 438 N.W.2d 349, 354-

55 (Mich. Ct. App. 1989).

"'A wrongful act per se is an act that is inherently wrongful or an act that can

never be justified under any circumstances.'" *Badiee v. Brighton Area Schs.*, 695

N.W.2d 521, 539 (Mich. Ct. App. 2005) (quoting *Prysak v. R L Polk Co.*, 483 N.W.2d

629 (1992)).  Whereas, "[t]o establish that a lawful act was done with malice and without

justification, the plaintiff must demonstrate, with specificity, affirmative acts by the

defendant that corroborate the improper motive of the interference." *BPS Clinical Labs.*

*v. Blue Cross and Blue Shield of Mich.*, 552 N.W.2d 919, 925 (Mich. Ct. App. 1996).

Those acts motivated by reasonably legitimate business reasons do not constitute

improper motive or interference. *Id.* at 924-25.  Accordingly, evidence of "improper

motive," and thus evidence of malice, must lie somewhere beyond the realm of legitimate business purposes. Because Plaintiff produces no evidence of any actions other than lawful ones motivated by legitimate business reasons, Plaintiff cannot meet its burden on its tortious interference claim.

Plaintiff maintains that Defendant's tortious interference claim regarding the VA customers fails because Defendant has not produced evidence sufficient to allow a jury to find the intentional doing of a per se wrongful act or the doing of a lawful act with malice. Defendant describes tortious acts as follows:

> AIPM used per se wrongful means to interfere with Oakstone's clients, including threatening the VA's and intentionally confusing the marketplace. For example, Joyce Seltzer (VISN 10) complained that AIPM was "threatening [in 2008] when [it] didn't select them. They could make 'trouble' based on government bidding." (Appdx Ex. 6-A (Cantrell Depo.)). AIPM also threatened the Milwaukee VA (VISN 12) that if the bid was not awarded to AIPM, AIPM would challenge the bid and cause them not to receive any VA calendars. (Cantrell Depo., Appdx Ex. 6 at 145:5-14). AIPM's interference with the bidding process for these VA calendars is per se wrongful. 801 F. Supp. at 1459-60.
>
> In addition, AIPM circulated false information to certain VAs in order to boost its credibility in the marketplace. (Cantrell Depo. Appdx Ex. 6 at 117:8-19). AIPM also intentionally confused the marketplace by creating a cover for its 2010 calendar that used the same graphic from Oakstone's 2008 VA calendar. (*Id.* at 124:3-10). In fact, one VA entity, VISN 19, was under the impression that it had purchased the Oakstone 2010 calendar, but had actually purchased AIPM's calendar. (*Id.* at 127:23-25, 128:1-5). AIPM also represented to one VA entity, Dallas (VISN 17), that it had done calendars in the past, implying that it was the VA calendar. (*Id.* at 131:2-13). AIPM's actions establish a genuine issue of material fact as to whether AIPM tortiously interfered with the Oakstone's business relationships.

(Def.'s Resp. to Pl.'s Mot. for Summ. J. on Def.'s Countercl. 15-16.) Essentially, Defendant bases its allegation of tortious interference on three categories of actions: (1)

threatening to challenge the bidding process; (2) causing confusion in the marketplace; and (3) "circulating false information." None of the evidence cited by Defendant is sufficient to allow a jury to conclude that Plaintiff's alleged actions were per se wrongful or lawful acts done with malice. First, Defendant points to no evidence suggesting that challenging the bidding process was not within Plaintiff's rights. Because threatening to do a lawful act cannot be per se wrongful, and because Defendant has produced no corroborating evidence suggesting that the threats were made with malice, this action cannot form the basis for a tortious interference claim. The case cited by Defendant, *Advanced Power Sys. v. Hi-Tech Sys.*, 801 F. Supp. 1450 (E.D. Pa. 1992), to support its argument that Plaintiff's threats to challenge the bidding process were tortious is inapposite. In *Advanced Power*, the defendant allegedly *rigged* a bidding process. Since there is no evidence of rigging a bidding process, *Advanced Power* is not relevant. Second, Defendant points to no law suggesting that causing confusion in the marketplace is per se wrongful. Assuming that there are no trademark infringement issues, it seems well within the realm of healthy competition for businesses to seek to blur the lines between their products and those produced by competitors. Defendant complains that Plaintiff committed a per se wrongful act by using the same graphic on its calendar that Defendant had used on its own calendar. But this graphic was a common stock photo. (Def.'s Resp. to Pl.'s Mot. for Summ. J. on Def.'s Countercl., Ex. 31, Cantrell Dep. 124.) Accordingly, Defendant has produced no evidence suggesting that using the graphic was wrongful. Finally, Defendant's allegations that Plaintiff "circulated false information" are not supported by sufficient evidence to allow a jury to find that Plaintiff committed per se wrongful acts. Defendant cites two pieces of

evidence supporting its contention that Plaintiff circulated false information: hearsay evidence that Plaintiff represented, to a VA customer, that a calendar was "national" when it was not; and an email from Plaintiff informing a customer that it had produced and sold calendars before, which led the customer to mistakenly believe that Plaintiff had produced and sold VA calendars. One statement that a calendar was "national," without any showing that the statement was made with intent to defraud, and another *truthful* statement that potentially led to a misunderstanding, are simply not enough to support a claim of tortious interference. There is no evidence that these statements were made with intent to deceive or with malice. Because Defendant has not produced evidence of the intentional doing of a per se wrongful act or the doing of a lawful act with malice, its tortious interference claim regarding the VA customers must be rejected.

Plaintiff's only argument against Defendant's tortious interference claims regarding the non-VA clients is based on an alleged failure to produce a knowledgeable 30(b)(6) deponent. Defendant produced Saddie Cantrell as a 30(b)(6) deponent for the topic of Defendant's tortious interference claims involving the non-VA customers. Plaintiff argues that Cantrell had "no information" on this topic. (Pl.'s Reply to Def.'s Resp. to Pl.'s Mot. for Summ. J. on Def.'s Countercl. 5.) Plaintiff bases this conclusion on a series of questions posed to Cantrell. "If Cantrell did not have personal knowledge regarding this issue, and she admitted that she did not have any conversations with Juls Owensby or Jodi Costello regarding the issue to educate herself, logic dictates that Cantrell would have had no information . . . ." (*Id.*) As Defendant points out, logic does not dictate such a conclusion. Cantrell testified that she was not personally involved with the non-VA clients and that she had not spoken with those *most* knowledgeable on

the subject, i.e., Owensby and Costello. Neither of these statements suggest that Cantrell did not educate herself on the subject by some other means. Plaintiff failed to followup with critical questions to determine what, if anything, Cantrell knew about the tortious interference claim involving the non-VA clients. Because Plaintiff failed to establish that Cantrell possessed insufficient knowledge on the subject to serve as a proper 30(b)(6) deponent, the court will not grant summary judgment on Defendant's tortious interference claim insofar as it relates to the non-VA customers.

## B. Plaintiff's Breach of Contract Claim

Defendant has moved for summary judgment on Plaintiff's breach of contract claim. Defendant's first argument is the distributor agreement is not a binding contract for want of consideration and mutuality of obligation. As discussed above, however, there is an issue of material fact as to whether Plaintiff agreed to the exclusivity and preferred vendor terms. Such a term would be an agreement to refrain from something that Plaintiff had a right to do, namely, to market and promote calendars other than those produced by Defendant. And, as such, it is a legal detriment to Plaintiff and would provide sufficient consideration. Also, as stated above, Plaintiff has produced sufficient evidence to allow a finding that agreeing to accept a 10% commission on the Bay Pines transaction rather than the 20% that it thought it was due likewise would provide sufficient consideration.

Defendant also argues that summary judgment on this count is appropriate because Plaintiff has not met its burden to produce evidence sufficient to allow a jury to find that it was damaged by any alleged breach. Plaintiff argues that it was damaged by Defendant's alleged breach based on several arguments: Defendant's failure to make

timely commission payments; Defendant's incorrect calculation of commissions; Defendant's failure to provide verifying documents; and Defendant's termination of the distributor agreement without notice. Because the court concludes that Plaintiff has produced sufficient evidence to allow a finding that Defendant incorrectly calculated commissions, it need not address Plaintiff's other claims of damages. According to the distributor agreement the commissions for VA sales were to be based on "gross sale amount and excludes shipping and handling." (Pl.'s Mot. for Summ. J. on Def.'s Countercl. Ex. 4.) The commissions for non-VA sales, on the other hand, were to be based on "gross sales amount excluding shipping and handling, customization, translation, purchased photos/original illustrations not already in [Defendant's] archives and other special services." (*Id.*) Since "customization" was listed as excluded from non-VA sales but not listed as excluded from VA sales, the clear implication, *expressio unius est exclusio alterius*, is that customization was to be included in VA sales. Defendant admits that it included "standard customization" in its VA sales but excluded "additional customization." (Def.'s Mot. for Summ. J. on Count I at 14.) The distributor agreement, however, makes no distinction between "standard" and "additional" customization. Accordingly, Plaintiff has produced evidence sufficient to allow a finding that Defendant breached the distributor agreement by excluding "additional customization" charges when it calculated commissions. The court will therefore deny Defendant's motion for summary judgment on Plaintiff's breach of contract claim, Count I of the complaint.

## IV. CONCLUSION

IT IS ORDERED that "Plaintiff's Motion for Summary Judgment on Defendant's Counterclaim" [Dkt. # 22] is GRANTED IN PART and DENIED IN PART. It is granted as to Counts II, III, and IV in all respects, and it is granted as to Count V as it relates to VA customers. It is denied in all other respects.

IT IS FURTHER ORDERED that "Defendant/Counterclaim Plaintiff Oakstone Publishing, LLC's Motion for Partial Summary Judgment as to Count I" [Dkt. # 24] is DENIED.

IT IS FURTHER ORDERED that "Defendant/Counterclaim Plaintiff Oakstone Publishing, LLC's Motion for Partial Summary Judgment as to its Counterclaim" [Dkt. # 25] is DENIED.

Thus, after disposing of the parties' motions for summary judgment, the following survives: the entirety of Count I of Defendant's Counterclaim; County V of Defendant's Counterclaim, insofar as it relates to non-VA customers; and Plaintiff's complaint in its entirety.

S/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated: March 5, 2010

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, March 5, 2010, by electronic and/or ordinary mail.

 S/Lisa G. Wagner
Case Manager and Deputy Clerk
(313) 234-5522